IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIPOCINE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-622 (WCB) |
| | ) | |
| CLARUS THERAPEUTICS, INC., | ) | **REDACTED - PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |

## OPENING BRIEF IN SUPPORT OF DEFENDANT CLARUS'S
## MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Robert F. Green
Christopher T. Griffith
Caryn C. Borg-Breen
Ann K. Kotze
GREEN, GRIFFITH
& BORG-BREEN LLP
City Place, Suite 3900
676 North Michigan Avenue
Chicago, IL 60611
(302) 883-8000

Jeffrey S. Ward
GREEN, GRIFFITH
& BORG-BREEN LLP
8215 Greenway Blvd., Suite 220
Middleton, WI 53562
(312) 883-8000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant Clarus Therapeutics, Inc.*

**Original Filing Date: October 2, 2020**
**Redacted Filing Date: October 9, 2020**

## TABLE OF CONTENTS

I.     NATURE AND STAGE OF THE PROCEEDINGS ........................................ 1

II.    SUMMARY OF ARGUMENT ................................................................... 2

III.   STATEMENT OF UNDISPUTED FACTS ................................................... 4

    A.   The Asserted Claims Are Directed to Methods of Achieving
         Certain PK Results using a Broad Range of Oral TU Compositions
         and Dosing Schedules .......................................................................... 4

    B.   The Specification Provides a Broad Disclosure of Potential
         Excipients and No Formulation Guidance ............................................. 7

    C.   The Specification Discloses Very Few Compositions Suitable for
         Use According to the Method of the Asserted Claims ......................... 11

    D.   A Skilled Artisan Would Need to Test "Many Thousands" of
         Formulations to Practice the Full Scope of the Claimed Method ......... 16

IV.    ARGUMENT ....................................................................................... 18

    A.   The Asserted Claims are Invalid for Failure to Comply with the
         Written Description Requirement of § 112 ........................................... 18

         1.   The Asserted Claims Encompass "Many Thousands" of
               Formulations While the Specification Describes Only Two
               Compositions Capable of Producing the Claimed PK
               Results Following Administration According to the
               Claimed Method ...................................................................... 19

         2.   The Asserted Claims Recite Dosing Parameters Which
               Differ From the Dosing Parameters Used in the
               "Simulated" Examples ............................................................ 25

         3.   The Asserted Claims Violate the "Quid Pro Quo" Which
               the Written Description Requirement Seeks to Protect ............ 26

    B.   The Asserted Claims are Invalid for Lack of Enablement Under §
         112 ...................................................................................................... 28

         1.   The Nature of the Alleged Invention and Breadth of Claims .................. 29

         2.   The State of the Prior Art and Predictability of the Art ........................... 29

         3.   Presence and Number of Working Examples ........................................... 31

4.      Amount of Direction or Guidance Presented ............................................ 31

5.      Quantity of Experimentation Needed ....................................... 32

6.      Summary Judgment is Proper in View of The Federal Circuit's Decisions in *Wyeth*, *Enzo*, and *Idenix* ....................................... 33

V.     CONCLUSION ................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,*
  759 F.3d 1285 (Fed. Cir. 2014) ..................................................................... 19, 25

*Ariad Pharm., Inc. v. Eli Lilly & Co.,*
  598 F.3d 1336 (Fed. Cir. 2010) ..................................................................... 23, 27

*Bos. Sci. Corp. v. Johnson & Johnson,*
  647 F.3d 1353 (Fed. Cir. 2011) ................................................................ 4, 19, 23

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,*
  541 F.3d 1115 (Fed. Cir. 2008) ........................................................... 4, 19, 23, 24

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.,*
  928 F.3d 1340 (Fed. Cir. 2019),
  *cert. denied,* 140 S. Ct. 2634, 206 L. Ed. 2d 513 (2020) ............................ 4, 29, 34

*Gen. Hosp. Corp. v. Sienna Biopharmaceuticals, Inc.,*
  888 F.3d 1368 (Fed. Cir. 2018) ............................................................................ 26

*Idenix Pharm. LLC v. Gilead Scis. Inc.,*
  941 F.3d 1149 (Fed. Cir. 2019) ..................................................................... passim

*In re Alonso,*
  545 F.3d 1015 (Fed. Cir. 2008) ............................................................................ 22

*In re Fisher,*
  427 F.2d 833 (CCPA 1970) .................................................................................. 31

*In re Wands,*
  858 F.2d 731 (Fed. Cir. 1988) ......................................................................... 28, 29

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.,*
  687 F.3d 1377 (Fed. Cir. 2012) ...................................................................... 28, 29

*MorphoSys AG v. Janssen Biotech, Inc.,*
  358 F. Supp. 3d 354 (D. Del. 2019) ................................................................ 28, 33

*Novozymes A/S v. DuPont Nutrition Biosciences APS,*
  723 F.3d 1336 (Fed. Cir. 2013) ............................................................................ 24

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.,*
  323 F. Supp. 3d 566 (D. Del. 2018) ................................................. 21, 22, 24, 25

*Purdue Pharma L.P. v. Faulding Inc.,*
  230 F.3d 1320 (Fed. Cir. 2000) ............................................................................ 26

*Univ. of Rochester v. G.D. Searle & Co.*,
  358 F.3d 916 (Fed. Cir. 2004) ................................................................... 19

*Wyeth & Cordis Corp. v. Abbott Labs.*,
  720 F.3d 1380 (Fed. Cir. 2013) ....................................................... passim

**Statutes**

35 U.S.C. § 112............................................................................................ 2, 35

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Lipocine Inc. ("Lipocine") filed this action on April 2, 2019 against Defendant Clarus Therapeutics Inc. ("Clarus") alleging patent infringement arising from Clarus's intent to market and sell its JATENZO® oral testosterone undecanoate product. Clarus launched its JATENZO® product in February 2020. Currently, Lipocine asserts that Clarus has induced and/or contributed to the infringement of claims 1, 2, 14, 17, 22 and 26 of U.S. Patent No. 9,034,858 (Exh. A[1], "the '858 Patent"); claims 2, 4, 5, 7, 9, 17 and 21 of U.S. Patent No. 9,205,057 (Exh. B, "the '057 Patent"); claims 7, 8, 11, 12, 17, 18 and 21 of U.S. Patent No. 9,480,690 (Exh. C, "the '690 Patent"); and claims 1, 4, 7 and 11 of the U.S. Patent No. 9,757,390 (Exh. D, "the '390 Patent") (collectively, the "Asserted Claims") by physicians and/or patients prescribing and using JATENZO®.

The Court issued a Claim Construction Order on March 20, 2020. (D.I. 119.) Pursuant to the Amended Scheduling Order entered May 11, 2020, Fact Discovery closed on June 5, 2020, Opening Expert Reports were exchanged on July 17, 2020, Rebuttal Expert Reports were exchanged on August 14, 2020, Reply Expert Reports were exchanged on September 4, 2020, and Expert Discovery closes on October 2, 2020. (D.I. 124.) Pursuant to the Court's granting of Clarus's Motion to Amend its Counterclaims to Assert Inequitable Conduct (D.I. 169) and Supplemental Scheduling Order entered September 4, 2020 (D.I. 176), expert discovery relating to inequitable conduct was extended until October 14, 2020, with Lipocine being given until September 14, 2020 to serve supplemental expert reports limited to inequitable conduct, and Clarus being given until September 24, 2020 to serve reply expert reports limited to the same issue. (*Id.*) Because the parties have mutually agreed to consolidate issues for depositions, certain expert

---

[1] "Exh. A" to "Exh. P" refer to exhibits attached to the declaration of Benjamin D. Witte filed concurrently herewith.

depositions will not be completed until October 16, 2020. Accordingly, Clarus reserves the right, to the extent necessary, to supplement its arguments in support of this Summary Judgment Motion with citations to the deposition transcripts of Lipocine's experts in its Reply Brief to be filed on November 2, 2020.

A Pretrial Conference is scheduled for January 8, 2021 and Trial is scheduled to begin on February 8, 2021. (D.I. 124 at 2.)

## II.   SUMMARY OF ARGUMENT

1.      Each of the Asserted Claims is invalid under 35 U.S.C. § 112 as lacking written description and as lacking enablement.

2.      The scope of the Asserted Claims is defined by functional limitations. Specifically, the Asserted Claims are directed to methods of achieving certain pharmacokinetic (PK) targets following administration of an oral testosterone undecanoate (TU) composition, measuring the serum testosterone levels in the male, and then adjusting the dose of the TU composition to be administered in a maintenance regimen to be within the range of -40% to +40% of the prior administered dose. Thus, all of the Asserted Claims require the achievement of a pharmacokinetic (PK) result in the individual to whom the TU composition is administered.

3.      Because the Asserted Claims contain minimal formulation restrictions, there is no dispute that the methods recited by the Asserted Claims encompass at minimum "many thousands" of oral TU compositions. Indeed, given the lack of formulation restrictions, one of Lipocine's experts has testified that there is "no finite number" of compositions encompassed by the scope of the Asserted Claims.

4.      In support of these extremely broad and functionally-defined claims, the specification of the Patents-in-Suit (the "Specification") provides only limited disclosure and limited guidance. The Specification provides long laundry lists of potential excipients to use,

2

without any guidance on what combinations of excipients are needed to result in a composition capable of being used in accordance with the methods of the Asserted Claims. While the Specification provides a number of "example" compositions, for the great majority it provides no information concerning their PK properties upon administration to a human subject.

5.      Actual PK information based on clinical data in humans is provided in the Specification for only six oral TU compositions, but that information does not include the use of these compositions in the claimed methods. Instead, that PK information relates to information obtained upon single dose administration, which, for example, does not involve titration. Further, two of these compositions, the compositions of Examples 44 and 45, are prior art Clarus formulations and the PK information for those compositions also came from Clarus. With respect to the claimed methods, the Specification provides only "estimated" PK results from rudimentary simulations, which were only performed with respect to the four compositions showing desirable PK results upon single dose administration. Two of these compositions are the Clarus compositions of Examples 44 and 45. The other two compositions (Example 40 and 41) are similar variants of a composition disclosed by Lipocine in the prior art. Further, the dose adjustment method is restricted to a 40% adjustment relative to the initial daily dose – merely one dose adjustment scheme among many covered by the Asserted Claims.

6.      It is undisputed that a person of ordinary skill as of May 2012 would have understood that the PK properties of an oral TU composition will be impacted by the selection of formulation excipients and that PK results from one composition cannot be extrapolated to another composition containing different amounts of TU in various forms, different excipients, or even the same excipients in different amounts. Thus, a POSA in 2012 would have understood that it would be necessary to generate human clinical data to determine which compositions are capable of use

in accordance with the methods of the Asserted Claims. This would require the POSA to make and test a representative number of the "many thousands" of oral TU compositions covered by the Asserted Claims in order to practice the full scope of the invention. Such a level of experimentation is undue.

7.      As a result, summary judgment of invalidity for lack of written description should be granted because the Asserted Claims cover at minimum "many thousands" of formulations for use in the claimed methods and are far broader than the disclosure of the Specification and the inventors' contribution to the art. *See Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366-67 (Fed. Cir. 2011); *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122-23 (Fed. Cir. 2008).

8.      Summary judgment of invalidity for lack of enablement should also be granted because the information and guidance provided by the Specification is so limited that it would require undue experimentation by a person of ordinary skill to practice the full scope of the claimed method. *See Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1386 (Fed. Cir. 2013); *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1349 (Fed. Cir. 2019), *cert. denied,* 140 S. Ct. 2634, 206 L. Ed. 2d 513 (2020); *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1163 (Fed. Cir. 2019).

## III.    STATEMENT OF UNDISPUTED FACTS

### A.      The Asserted Claims Are Directed to Methods of Achieving Certain PK Results using a Broad Range of Oral TU Compositions and Dosing Schedules

The methods of the Asserted Claims require achievement of certain PK results following administration of an oral TU composition. Some claims require achieving an undefined steady state "target" serum testosterone concentration $C_{ave}$ range (Exh. A, the '858 Patent, claims 1, 2, 14, 17, 22, 26). Other claims require achieving a serum testosterone $C_{ave}$ in the specific range of

300-1100 ng/dL (all Asserted Claims of the '057, '690 and '390 Patents) or 350-850 ng/dL (the '858 Patent, claim 14). (Exhs. B-D.) Some claims require achieving a combination of PK results including a steady state serum testosterone $C_{ave}$ of 300 ng/dL to 1100 ng/dL in at least 75% of a group of hypogonadal male subjects, and a serum testosterone $C_{max}$ of a) less than 1500 ng/dL in at least 85% of the subjects in the group; b) about 1800 ng/dL to about 2500 ng/dL in 5% or less of the subjects in the group; or c) greater than 2500 ng/dL in about 1% or less of the subjects in the group. (Exh. A, the '858 Patent at claim 26.) Still other claims require "upon single dose administration" a ratio of serum testosterone $C_{max}$ to $C_{ave}$ of 2.7 or less, or a dose-normalized serum testosterone $C_{ave}$ of about $1.9 \times 10^{-6}$ dL$^{-1}$ or higher (*id.* at claims 1, 2, 14, 17). Each of these claim limitations reciting a PK result following administration of the oral TU composition is a functional limitation of the claims because it defines the characteristic of the oral TU composition when administered.

With respect to the formulations to be administered, there are few non-functional limitations. For some claims (*id.* at claims 22, 26) the only limitation placed on the composition is that it comprises TU. For other claims (*id.* at claims 1, 2, 14, 17; Exh. D, the '390 Patent, claims 1, 4, 7) the only limitation is that the composition comprises about 14 wt.% to about 35 wt.% TU. While some of the Asserted Claims from the '057, '690, and '390 Patents require the inclusion of a specific excipient or excipients in addition to requiring that the compositions comprise about 14 wt.% to about 35 wt.% TU, these claims are still extremely broad. As shown in the table below, the great majority of the Asserted Claims from these patents simply require one or more excipients chosen from broad excipient categories, without reference to any specific excipient or the amount of any such excipient. Those Asserted Claims that actually name a specific excipient (*e.g.*, Exh. B, the '057 Patent, claim 4; Exh. C, the '690 Patent, claim 21) fail to provide information on how

much of that excipient should be present and the one Asserted Claim (Exh. B, the '057 Patent at claim 9) that provides an excipient amount requires only that the excipient come from the broad category of "solubilizers."

| Patent | Claim(s) | Required Carrier Excipient(s) |
|--------|----------|-------------------------------|
| '057 | 2 | a solubilizer and a dispersant |
| | 4 | oleic acid |
| | 5 | a polyoxyethylene hydrogenated vegetable oil |
| | 9 | a solubilizer in an amount from about 50 wt % to about 86 wt % |
| | 17 | a monoglyceride, a diglyceride, a fatty acid, a polyoxyethylene hydrogenated vegetable oil or a combination thereof |
| | 21 | a triglyceride, a sterol derivative, an ionic hydrophilic surfactant, a non-ionic hydrophilic surfactant, an alcohol or a combination thereof |
| '690 | 7, 8, 11, 17, 18 | a fatty acid and a polyoxyethylene hydrogenated vegetable oil |
| | 12 | a fatty acid and a polyoxyethylene hydrogenated vegetable oil and a triglyceride |
| | 21 | oleic acid and Cremophor RH 40 and monoglyceride, a diglyceride, a triglyceride, an antioxidant or a combination thereof |
| '390 | 11 | one or more of: a fatty acid, a monoglyceride, a diglyceride and a polyoxyethylene hydrogenated vegetable oil |

(Exhs. B-D.)

Finally, all the Asserted Claims employ the open-ended "comprising" transitional term, and thus allow for the inclusion of additional ingredients beyond those recited in a given claim. In sum, there is no genuine dispute that the Asserted Claims encompass "many thousands" of potential oral TU compositions. (Exh. 1[2], Amiji Opening Report ("Op. Rep.") at e.g., ¶¶ 31, 248-258, 266, 276, 288, 296; (Exh. E, Berkland Rebuttal Report ("Reb. Rep.") at e.g., ¶¶ 131-134; 139; 142-145; 148-151.)

With respect to the daily dosage of TU to be administered to the patient according to the method, the Asserted Claims recite various ranges for that dose, including: (i) about 360 mg to

---

[2]Exh. 1 and Exh. 2 refer to the July 17, 2020 Opening Expert Report and September 4, 2020 Reply Expert Report, respectively, of Mansoor M. Amiji, Ph.D., attached to the declaration of Mansoor M. Amiji filed concurrently herewith.

about 480 mg (Exh. A, the '858 Patent, claims 1, 2, 14, 17; Exh. B, the '057 Patent, claims 2, 4, 5, 7, 9, 21; Exh. C, the '690 Patent, claims 7, 8, 21); (ii) about 350 mg to about 650 mg (Exh. A, the '858 Patent, claims 22, 26; Exh. B, the '057 Patent, claim 17; Exh. C, the '690 Patent, claims 12, 17, 18); (iii) about 450 mg or about 480 mg (Exh. D, the '390 Patent, claims 1, 4, 11); or (iv) about 480 mg (*id.* at claim 7). And, the Asserted Claims, as construed by the Court, require the maintenance dose to be any dose "within the range of 40% less than to 40% more than" the prior dose. (D.I. 119 at 41-42.)

Thus, the limitations of the Asserted Claims are largely functional in nature with few nonfunctional limitations defining the scope of oral TU compositions encompassed by the claims.

### B. The Specification Provides a Broad Disclosure of Potential Excipients and No Formulation Guidance

The Specification[3] acknowledges that oral delivery of TU "remains a challenge" due to "extremely poor bioavailability," and because TU is "extremely lipophilic" it "must be presented in a bioacceptable solubilizer" to promote absorption. (Exh. A, the '858 Patent at 1:46-49; 1:67-2:9.) Yet, despite these acknowledgements, the Specification asserts broadly and without support that oral TU compositions "can be formulated such that" they achieve various desired results.

For example, the Specification states that capsules "can be formulated such that they have distinctive release profiles" (*id.* at 18:6-7; *see also* 18:8-67) or that capsules "can be formulated such that" when administered to a human male they provide a serum total testosterone $C_{avg}$ ranging about 300 ng/dL to about 1100 ng/dL (or other similar ranges) (*id.* at 19:9-28). Also, with respect to achieving certain target dose normalized $C_{max}$ and $C_{avg}$ values or ratios of serum TU $C_{avg}$ to serum T $C_{avg}$ or ratio of serum total testosterone $C_{avg}$ to dose of TU, the Specification asserts that

---

[3] The specification of each of the Patents-in-Suit are identical. All citations to the Specification set forth herein are to the specification of the '858 Patent, but identical statements appears in the specifications of the '057, '690, and '390 Patents.

the capsules "can be formulated such that" these results can be achieved. (*id*. at 19:32-54). Finally, the Specification states that the capsules "can be formulated such that" the formulation provides a serum T $C_{ave}$ of 300-1100 ng/dL in at least 75% of subjects, a serum T $C_{max}$ of less than 1500 ng/dL in at least 85% of subjects, a serum T $C_{max}$ of 1800-2500 ng/dL in less than 5% of subjects, and/or a serum T $C_{max}$ greater than 2500 ng/dL in about 1% or less of subjects. (*Id*. at 21:19-34.)

However, the Specification fails to teach *how* to formulate the compositions "such that" they can be used in accordance with the claimed methods to achieve a desired PK result. Instead, the Specification provides only broad teachings that the compositions should include TU together with a "solubilizer" optionally in combination with a "dispersant," "solidifying agent" and/or "additive." (*Id.* at 13:10-17:52; 24:20-26.)

The Specification discloses that the TU can be present in amounts sufficient to comprise 14 wt% to about 35 wt% of the composition. (*Id.* at 12:43-46.) It further states that the TU can be in fully dissolved form, or that at least 35% or at least 66% of the TU can be present in dissolved form, with the rest being undissolved. (*Id*. at 12:54-59.) The Specification also states that in another embodiment, at least about 5 wt% of the TU is present in undissolved form. (*Id*. at 12:59-61.)

The Specification provides that the "solubilizer" can be "selected from a variety of compounds and mixtures of compounds that have the ability to facilitate loading" of TU and that "[n]on-limiting examples of solubilizers" can include $C_8$ to $C_{22}$ fatty acid glycerides and omega fatty acids. (*Id.* at 13:10-13, 27-29.) Lipocine's expert Dr. Berkland does not dispute that the choice of the solubilizer could impact the pharmacokinetic parameters of the formulation. (Exh. F, Berkland Dep. Tr. at 65:13-17.) These agents are further described according to lengthy "non-limiting" lists of "medium and/or long chain" monoglycerides and/or diglycerides as well as triglycerides derived from various source oils, or in the alternative one or more alcohols selected

8

from a long list, as well as "mixtures thereof." (Exh. A, the '858 Patent at 13:27-14:42.) Lipocine's expert Dr. Berkland agreed a POSA would "certainly" need to consider the solubilizers identified in these lists, but further noted that a POSA must consider additional solubilizers, because the lists are not exclusive. (Exh. F, Berkland Dep. Tr. at 58:4-58:16.) Further increasing the breadth of possibilities, Dr. Berkland acknowledged that several of the solubilizers identified in the Specification (*e.g.*, C8-C22 fatty acid glycerides, omega fatty acids, monoglycerides, and diglycerides) actually refer to a "category" of excipients which would each encompass "dozens" of options to sort through. (*Id*. at 58:17-59:8; 60:8-61:2; 61:9-22; 62:10-22; *see also* 64:17-65:11.) Dr. Berkland admitted that he has not calculated in totality how many different solubilizers are identified in the Specification. (*Id*. at 66:19-22.) The Specification also does not identify any preferred "solubilizer." The Specification states that a solubilizer (or combination of solubilizers) can be present in an amount ranging from "about 50 wt % to about 86 wt %" or "about 55 wt % to about 82 wt %, or "about 60 wt % to about 80 wt %." (Exh. A, the '858 Patent at 13:10-22.)

The Specification provides that the "dispersant" can be "any pharmaceutically acceptable additive that enables the contents of the compositions and/or oral dosage capsules to disperse in an aqueous medium" (*id*. at 3:66-4:2), and can be a hydrophilic surfactant or a lipophilic surfactant, or combinations thereof (*id*. at 4:43-51). Lipocine's expert Dr. Berkland does not dispute that the choice of the dispersant could impact the pharmacokinetic parameters of the formulation. (Exh. F, Berkland Dep. Tr. at 70:7-17.) The Specification provides "non-limiting" lists of classes of hydrophilic and lipophilic surfactants from which to choose the surfactant(s). (Exh. A, the '858 Patent at 15:15-38 (hydrophilic surfactants); 16:14-17:6 (lipophilic surfactants).) The number of surfactants identified is extensive, encompassing many hundreds, if not thousands, of potential surfactants or surfactant combinations. (Exh. 1, Amiji Op. Rep. at ¶ 255.) Moreover, Dr. Berkland

acknowledged that certain dispersants identified in the Specification actually refer to a "category" of excipients which would encompass "dozens" of options "that are pharmaceutically relevant." (Exh. F, Berkland Dep. Tr. at 69:6-19; 69:21-70:6.) The Specification does not identify preferred surfactants to be used as the "dispersant" and does not identify any preferred amount(s) of dispersant. In addition, the Specification provides that the dispersant, especially a lipophilic dispersant, can also function as the solubilizer. (Exh. A, the '858 Patent at 16:55-58; *see also* 15:13-15.) This further increases the category of potentially useful "solubilizers."

The Specification provides that the solidifying agent can be any "pharmaceutically acceptable additive that is in a solid physical state at 20° C." (*Id*. at 4:24-27; 17:7-11.) The Specification discloses a long, "non-limiting" list of solidifying agents from which to choose, but does not identify any solidifying agent as preferred. (*Id*. at 17:32-48.) Dr. Berkland admitted that the Specification disclosed at least "dozens" of potential solidifying agents and that the choice of the solidifying agent could impact the pharmacokinetic parameters of the formulation. (Exh. F, Berkland Dep. Tr. at 75:13-76:6; 76:7-16.) The Specification discloses the solidifying agent may be present in an amount of from about 0.1 wt.% to about 25 wt.%, about 2 wt.% to about 20 wt.%, about 3 wt.% to about 15 wt.%, about 3 wt.% to about 9 wt.%, or from 6 wt.% to 9 wt.%. (Exh. A, '858 Patent at 17:20-31.)

The Specification further states that the inventive compositions can include one or more additional additives, including binders, bufferants, diluents, disintegrants, flavors, colorants, taste-masking agents, resins, pH modifiers, lubricants, glidants, thickening agents, opacifying agents, humectants, desiccants, effervescing agents, plasticizing agents, "and the like." (*Id*. at 24:20-26.) The Specification does not identify any preferred additive or any suggested amount(s) of the additives.

Continuing with its broad disclosure, the Specification discloses that the dosage forms can be immediate release, extended release, targeted release, enteric release, delayed release, or combinations thereof. (*Id*. at 17:63-65.) Accordingly, a broad range of target release profiles are disclosed, ranging from 90% drug release within 30 minutes to less than 75% release over 120 minutes. (*Id*. at 18:6-35; 20:49-61; Table XV at Examples 31 and 35.) In some embodiments, the dosage forms contain one or more populations of TU compositions, with at least one population being an immediate release composition, or a delayed release composition. (*Id*. at 18:36-66.) For the delayed release compositions, the Specification states they can be formulated to release TU at a certain point in the GI tract, or after a certain amount of time has passed since ingestion of the composition. (*Id*.)

Finally, the Specification discloses a series of Example compositions (Examples 1-47) comprising TU including a broad range of solubilizers and optional dispersants and/or solidifying agents that are stated to provide TU loading within the range of 12 wt.% to 39.5 wt.%. However, the Specification includes little discussion of these Example compositions except to note that the compositions were made and, in a few instances, were reported to have various release profiles and/or stability results. The Specification does not identify what release profile is desirable and does not attempt to correlate any release profile with a desired PK property. The Specification also does not indicate, for any oral TU composition, what is the relationship between the dose of the drug administered and the resulting PK serum levels of the drug.

### C.    The Specification Discloses Very Few Compositions Suitable for Use According to the Method of the Asserted Claims

The only disclosure in the Specification concerning PK results achieved or predicted by administration of compositions comprising TU appears in Examples 48-53. Examples 48 and 49

are the only examples to provide any actual PK data in humans. Examples 50-53 present "estimated" PK results of various simulations conducted using the actual PK data.

Examples 48 and 49 present PK data based on the administration of a single dose of an oral TU composition to human subjects for a total of six different oral TU compositions (Examples 15A, 40, 41, 44, 45, and 47). Of the compositions evaluated, the inventors identified only Examples 40, 41 and 45 as providing the desired dose normalized $C_{max}$ and lower $C_{max}$ to $C_{ave}$ ratio values,[4] and only Examples 40 and 41 provide the desired higher dose-normalized $C_{ave}$ value, as compared to the Clarus formulation Examples 44 and 45.

Moreover, Examples 40, 41, 44, and 45 represent a very limited scope of oral TU compositions. As shown in Table XVIII of the '858 Patent, the compositions of Examples 40 and 41 are similar, containing the same ingredients in very similar amounts.

TABLE XVIII

| Capsule Components/ Attributes | Example 39 | Example 39A | Example 40 | Example 41 | Example 42 |
|---|---|---|---|---|---|
| Testosterone Undecanoate, wt % | 14 | 14 | 15 | 18 | 18 |
| Monoglycerides (e.g. maize oil monoglycerides, Maisine 35-1), wt % | 64 | 75 | 63 | 68 | 68 |
| Hydrophilic surfactants (e.g. Cremophor RH40, Cremophor EL), wt % | 16 | 5 | 16 | 8 | 14 |
| Fatty acids (e.g. linoleic acid, Linolenic acid, Oleic Acid), wt % | — | — | — | — | — |
| Triglyceride (e.g. castor oil, maize oil, borage seed oil, lauroglycol, corn oil etc.), wt % | — | — | — | — | — |
| Lipophilic surfactant (e.g. propylene glycol monolaurate), wt % | — | — | — | — | — |
| Solidifying agent (e.g. polyethylene glycol 8000), wt % | 6 | 6 | 6 | 6 | — |
| % TU dissolved at RT | 70-75 | 85-92 | 65-70 | 50-55 | 55-60 |
| % TU undissolved fraction at RT | 25-30 | 8-15 | 30-35 | 45-50 | 40-45 |

*It is noted that the compositions can also include one or more components such as anti-oxidants (e.g. BHA, BHT, Ascorbyl palmitate, vitamin E or combinations), flavorings etc.

---

[4] Example 15A is shown to have the same range of dose-normalized $C_{max}$ and mean $C_{max}$ to mean $C_{ave}$ ratio values as Examples 40 and 41, but the inventors do not identify it as preferred. (Exh. A, the '858 Patent, 37:36-40.) The formulation of Example 15A is set forth in Table XII as having 18% (90 mg) TU, 63% (315 mg) Maisine 35-1 maize oil glycerides, 7% (35 mg) Cremophor RH40, and 12% (60 mg) Precirol ATO-5 glyceryl distearate. Example 47 is shown to have an undesirably high mean $C_{max}$ to mean $C_{ave}$ ratio, and an undesirably low dose-normalized $C_{max}$. (*Id.*)

In addition, as shown in Table XIX of the '858 Patent, the compositions of Examples 44 and 45 are similar, containing the same ingredients in very similar amounts.



TABLE XIX

| Capsule Components/ Attributes | Example 43 | Example 44 | Example 45 | Example 46 | Example 47 |
|---|---|---|---|---|---|
| Testosterone Undecanoate, wt % | 25 | 18 | 20 | 12 | 12 |
| Monoglycerides (e.g. maize oil monoglycerides, Maisine 35-1), wt % | 70 | — | — | — | — |
| Hydrophilic surfactants (e.g. Cremophor RH40, Cremophor EL), wt % | 5 | 17 | 16 | — | — |
| Fatty acids (e.g. linoleic acid, Linolenic acid, Oleic Acid), wt % | — | 53 | 52 | 88 | — |
| Triglyceride (e.g. castor oil, maize oil, borage seed oil, lauroglycol, corn oil etc.), wt % | — | 12 | 12 | — | 53 |
| Lipophilic surfactant (e.g. propylene glycol monolaurate), wt % | — | — | — | — | 35 |
| Solidifying agent (e.g. polyethylene glycol 8000), wt % | — | — | — | — | — |
| % TU dissolved at RT | 40-45 | 100 | 100 | 100 | 100 |
| % TU undissolved fraction at RT | 55-60 | 0 | 0 | 0 | 0 |

*It is noted that the compositions can also include one or more components such as anti-oxidants (e.g. BHA, BHT, Ascorbyl palmitate, vitamin E or combinations), flavorings etc.

And interestingly, as stated above, the compositions of Examples 44 and 45 were not even invented by Lipocine. Inventor Dr. Chidambaram admitted that ███████████████████ ████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████( ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

[5] Exh. G, United States Patent Application Publication 2011/0251167 A1 (Dudley et al. – Clarus Therapeutics, Inc.), published October 13, 2011.

[6] Exh. H, Yin et al., "Reexamination of Pharmacokinetics of Oral Testosterone Undecanoate in Hypogonadal Men With a New Self-Emulsifying Formulation," *J. Androl.*, published online April 7, 2011.



*see also* D.I. 174 (Response to Counterclaims) at ¶¶ 79, 81.)

Examples 50-53 provide the results of "estimated" or "simulated" studies in which a given dose of an oral TU composition is administered and either one, two or three dose adjustment steps are carried out wherein the dose is adjusted by ±40% of the "IDD" or initial daily dose using the concept of "dose proportionality," whereby an increase in drug dose is assumed to result in a comparable increase in drug levels in the body. During his deposition, inventor Dr. Chidambaram explained that

*see also, e.g.*, Exh. A, the '858 Patent at 38:10-23.)

The inventors report that only Example 40B (*i.e.*, the Example 40 composition at a daily dose of 360-420 mg) and Example 41 at a daily dose of 340-400 mg provided the desired PK results[8] following simulation in the absence of dose adjustment (Example 50), and only Example 40E (*i.e.*, Example 40 at a daily dose of 360-460 mg) provided the desired PK results following

---

[7] Formulation B, as published in Exh. G, Dudley II, is described as containing 19.8 wt.% TU, 16.0% Cremophor RH40, 51.6% oleic acid, 12.5% borage seed oil + peppermint oil.

[8] In these examples, the four desired PK endpoints are (1) >75% of subjects having $C_{avg}$ from 300-1100 ng/dL; (2) >85% of subjects having $C_{max}$ less than 1500 ng/dL; (3) <5% of subjects having $C_{max}$ between 1800-2500 ng/dL; and (4) <1% of subjects having $C_{max}$ greater than 2500 ng/dL. (Exh. A, the '858 Patent at 25:62-26:15).

one or two simulated dose adjustments of ±40% relative to the initial daily dose (Examples 51-52). (Exh. A, the '858 Patent at Examples 50-52.) Example 40 at a daily dose of 360-460 mg TU, Example 41 at a daily dose of 350-440 TU,  and Examples 44 and 45 (both at a daily dose of 580-650 mg TU)  produced the desired PK results following three simulated dose adjustments of ±40% (Example 53). (*Id.* at Example 53.)

The Specification in Examples 54 and 55 purports to identify titration metrics and dosing regimens for use in clinical practice, which are allegedly derived from the simulated PK measurements, but there is no data to support the proposed metrics or proposed dose adjustments of ±25-55%. Importantly, these examples do not provide any information on the compositions for which the simulated results are provided and make no predictions for dose adjustment increments smaller than ±25%. (*Id.* at 39:8-10; 39:49-51; 40:43-45.)

Thus, the Specification really identifies only <u>two</u> species of oral TU compositions (formulations 40/41 and formulations 44/45) that, ███████████████████████████ ████████████ are capable of producing the desired PK endpoint when used in a method of the claims. And, as discussed above, ████████████████████████████ ████████

During prosecution, the inventors identified the above-discussed "estimated" PK results as the ***only*** written description support for the claimed dosing regimen. (Exh. J, June 11, 2014 Amendment and Response at LPCN00001284-85; Exh. K, Specification as Filed at LPCN00000749-755.) Thus, although the Specification describes other compositions, the inventors recognized that these compositions alone did not describe the claimed methods. This is why Lipocine is not claiming a priority date for the Asserted Claims of prior to the filing of the '807 continuation-in-part application on May 31, 2012, even though the parent '206 application

15

filed on November 30, 2010 contained essentially the same disclosure regarding TU compositions and also included Examples 1-37. (Exh. K, Specification as Filed at LPCN00000697.)

### D.      A Skilled Artisan Would Need to Test "Many Thousands" of Formulations to Practice the Full Scope of the Claimed Method

As of May 2012, the priority date of the Asserted Claims, both Clarus's and Lipocine's experts agree that a person of ordinary skill in the art would have understood that TU is "a BCS Class IV drug," has "poor permeability characteristics," is "extremely lipophilic," is "mainly absorbed through the lymphatic route" and thus is "difficult to work with and pose[s] difficulties to achieving desired release, absorption, and bioavailability when orally administered to humans." (Exh. 1, Amiji Op. Rep. at ¶¶ 47-48; Exh. E, Berkland Reb. Rep. at ¶¶ 42, 51, 52.)

In addition, as of May 2012, both Clarus's and Lipocine's experts agree that a person skilled in the art would have understood that while TU absorption can be improved by using "mixtures of oils, surfactants, solvents, and other excipients to improve the oral bioavailability and absorption," the "improvement of absorption for these drugs is often ***dependent upon the characteristics of the excipients used***." (Exh. 1, Amiji Op. Rep. at ¶¶ 54-56; Exh. E, Berkland Reb. Rep. at ¶¶ 43, 116) (emphasis added).) ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Further, knowing that the formulation excipients impact TU absorption, both Clarus's and Lipocine's experts agree that a person skilled in the art would have understood that one cannot generalize the PK results of the compositions of Examples 40/41 or the Clarus compositions of Examples 44/45 to other compositions, and that testing would need to be performed on each additional composition falling within the scope of the Asserted Claims to determine whether it is

capable of producing the required PK results when administered according to the claimed methods. (Exh. 1, Amiji Op. Rep. at ¶¶ 264-267; Exh. E, Berkland Reb. Rep. at ¶ 131.)

According to Clarus's expert Dr. Amiji, a POSA would need to conduct clinical testing on each formulation in humans to determine its PK properties, and to determine the relationship between the dose administered and the resulting serum testosterone level. (Exh. 1, Amiji Op. Rep. at ¶¶ 248, 261-269.) And then, assuming the relationship between the dose and resulting serum T level can be reliably predicted across a range of doses, the POSA would need to carry out simulations similar to those set forth in the patent to determine whether the proposed starting dose and dose adjustments would be reasonably expected to produce the claimed PK results. (Exh. 1, Amiji Op. Rep. at ¶¶ 264-267.)

According to Lipocine's expert Dr. Berkland, to practice the full scope of the invention, "skilled artisans could feasibly make batches of different unit doses (*e.g.*, 50 or more) …within one or two days" and "could have designed a multi-variable experiment, to evaluate the effect of various types and amounts of excipients on surrogate *in vitro* tests for assessing *in vivo* behavior, such as dissolution." (Exh. E, Berkland Reb. Rep. at ¶¶ 132-133.) Dr. Berkland argues that a skilled artisan could further "set up a fractional factorial design experiment" in order "to expose information about the most important features of the formulation" and the "formulation results could then be used for further development, including correlation to existing clinical results and/or additional clinical testing." (*Id*. at ¶ 133.) Dr. Berkland recognizes that *in vitro* to *in vivo* "correlation" techniques do not currently exist for oral TU compositions, but argues that "testosterone undecanoate *in vitro* data has the potential to be correlated to *in vivo* absorption results for further formulation development." (*Id*. at ¶ 134.)

Either way, a POSA would need to undertake significant amount of testing before determining which of the at least "many thousands" of oral TU compositions is capable of being used in accordance with the methods of the Asserted Claims to produce the claimed PK results.

## IV.   ARGUMENT

### A.   The Asserted Claims are Invalid for Failure to Comply with the Written Description Requirement of § 112

In this case, the disclosure in the specification of the Patents-in-Suit is insufficient to provide a written description of the full scope of the invention of the Asserted Claims as a matter of law.

The subject matter of the Asserted Claims relates to the chemical and pharmaceutical arts. Accordingly, mere statements of the claimed genus in the specification are not sufficient to satisfy the written description requirement. Instead, the specification must include a description of a sufficient number of representative "species falling within the scope of the genus or structural features common to the members of the genus so that [a POSA] can 'visualize or recognize' the members of the genus." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014); *see also Carnegie Mellon Univ.*, 541 F.3d at 1124.

While questions of written description involve questions of fact, summary judgment of invalidity for lack of written description is proper when, as here, the disclosure in the specification is such that "no reasonable fact finder could return a verdict for the non-moving party." *Bos. Sci. Corp.*, 647 F.3d at 1361; *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926 (Fed. Cir. 2004) (summary judgment is proper when one cannot "distinguish infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods".)

**1.** **The Asserted Claims Encompass "Many Thousands" of Formulations While the Specification Describes Only Two Compositions Capable of Producing the Claimed PK Results Following Administration According to the Claimed Method**

As discussed above, the Asserted Claims are directed to methods of administration that require achieving various PK endpoints following administration of a wide range of oral TU compositions. In fact, the range of potential oral TU compositions falling within the scope of the Asserted Claims is at minimum on the order of "many thousands." (Exh. 1, Amiji Op. Rep. at *e.g.*, ¶¶ 31, 242, 248-258, 262, 266-267, 276, 288, 296; Exh. E, Berkland Reb. Rep. at *e.g.*, ¶¶ 131-134; 142-145; 148-151.) In fact, given the lack of substantial formulation limitations, Lipocine's expert Dr. Goldstein testified that in his view "there's no finite number" of formulations falling within the scope of the claims. (Exh. M, Goldstein Dep. Tr.[9] at 30:17-31:12.) Accordingly, the scope of the Asserted Claims is unquestionably broad. *See Carnegie Mellon Univ.*, 541 F.3d at 1125; *Bos. Sci. Corp.*, 647 F.3d at 1364.

In stark contrast to the breadth of oral TU compositions encompassed by the Asserted Claims, the only alleged written description support in the Specification is limited to *simulated* PK results for two species of oral TU compositions: Examples 40/41 and Examples 44/45. (*See infra* at § III.C-D, IV.A.2-3, B.6; Exh. J, June 11, 2014 Amendment and Response at LPCN00001284-85; Exh. K, Specification as Filed at LPCN00000749-755; Exh. A, the '858 Patent at Examples 51-53.) This is woefully inadequate. First, simulated PK data is not as reliable as actual PK data obtained by testing in humans.[10] Accordingly, the quality of this disclosure is marginal at best.

---

[9] The deposition of Dr. Goldstein occurred on October 1, 2020 and the final transcript is not yet available. Accordingly, citations to Dr. Goldstein's deposition refer to the rough transcript.

[10] In the real world, ███████████████████████████████████████████████████████████████████ ████████████████████████████████████ Despite the fact that the simulations predicted this formulation would meet all desired PK endpoints, in fact this formulation failed to meet some of

Second, two species of oral TU compositions cannot be considered "representative" of the entire genus of the at least "many thousands" of oral TU compositions that are encompassed by the Asserted Claims. Indeed, Lipocine's expert Dr. Berkland testified that although Examples 40 and 41 contain "the same ingredients, just in different weight percentages," even these small changes in concentrations may impact the pharmacokinetic parameters of the composition. (Exh. F, Berkland Dep. Tr. at 79:17-80:12.) Likewise, Dr. Berkland testified that while Examples 44 and 45 contain the same ingredients "just in slightly different amounts" that even these concentration changes of 1-2% may impact the pharmacokinetic parameters of the composition. (*Id.* at 80:17-81:15.)

As discussed above, the remainder of the Specification is of limited value because it fails to describe any generic formulation approach to assist a POSA in distinguishing between oral TU compositions that provide the claimed PK results when administered in accordance with the claimed method, and those that do not. The Specification asserts that the compositions "can be formulated such that" they achieve the desired pharmacokinetic results but identifies long laundry lists of "hundreds" of potential excipients to choose from. While Examples 1-47 of the Specification describe potential compositions, there is nothing to indicate which example compositions will work to achieve the claimed PK results in accordance with the claimed method. As such, there is no way for a POSA to distinguish an infringing formulation from a non-infringing one. *See Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 618 (D. Del. 2018) ("the specification must demonstrate that the applicant has made a generic invention

---

these same PK endpoints when tested in actual humans using a starting daily dose of 450 mg and dose adjustments of ±33%. (D.I. 174 (Response to Counterclaims) at ¶¶ 122-126.)

that achieves the claimed result" which "requires more than a generic statement of an invention's boundaries.")

The lack of guidance in the specification is highly problematic because the undisputed facts show that the specific formulation components will impact the resulting PK properties. (Exh. E, Berkland Reb. Rep. at ¶ 116 ("changes to the formulation may result in changes to the pharmacokinetic profile"); ████████████████████████

████████████████████████████████████████████

████████████████████████████ Lipocine's expert Dr. Berkland admitted in deposition that to achieve effective testosterone levels "the formulation components are an important consideration" (Exh. F, Berkland Dep. Tr. at 141:2-20) and "of course, contribute to lymphatic absorption." (*Id*. at 136:2-7.) Specifically, the bioavailability of an oral TU composition is "highly dependent on the excipients chosen, their concentration, and interactions with both the active compound and each other." (Exh. F, Berkland Dep. Tr. at 230:14-231:7; *see also* 218:2-6.) This necessarily means that only some oral TU compositions will be suitable for use in accordance with the claimed method.

Lipocine's expert, Dr. Weiner, tries to skirt the issue by arguing that "the invention is the titration method, not the formulations specifically recited in the patent," (Exh. N, Weiner Sept. 14th Reb. Rep. at ¶ 66), but this misses the mark. The Asserted Claims are directed to a titration method comprising the *administration of oral TU compositions*. Thus, the compositions that will work in the claimed methods must be adequately described. *See In re Alonso*, 545 F.3d 1015, 1017-1018 (Fed. Cir. 2008); *Pernix*, 323 F. Supp. 3d at 627-28. Further, during prosecution of these claims before the Patent Office, the Applicants made clear that it is the composition, not the method by which it is administered, that determines whether a desired PK target is attainable. (Exh. O,

(February 20, 2014 Amendment and Response) at LPCN00001196; Exh. J, (June 11, 2014 Amendment and Response) at LPCN00001289.) The fact that the claims are directed to methods rather than to compositions does not excuse the lack of guidance concerning which compositions will work in accordance with the claimed methods.

Lipocine's expert, Dr. Berkland, also acknowledges the extreme breadth of the Asserted Claims, but suggests it is not an issue. According to Dr. Berkland, a POSA would understand they could generate "*in vitro* data" and potentially correlate it to "*in vivo* absorption results" by designing "a fractional factorial design experiment" in order "to expose information about the most important features of the formulation." (Exh. E, Berkland Reb. Rep. at ¶¶ 133-34). Specifically, according to Dr. Berkland a POSA would examine different "variables" including "the inclusion or exclusion of different categories of ingredients, the specific ingredient you select in that category, and the amount, for example." (Exh. F, Berkland Dep. Tr. at 172:17-173:12.) As set forth above, Dr. Berkland acknowledged that many of these broad "categories" of excipients identified in the laundry lists set forth in the Specification refer to "dozens" of potential ingredients. (*Id.* at 58:17-59:8; 60:8-61:2; 61:9-22; 62:10-22; 69:6-19; 69:21-70:6; 75:13-76:6.) He also stated that the potential excipients are not limited to those set forth in these laundry lists. (*Id.* at 58:4-58:16.) However, the Specification does not describe any such correlation between *in vitro* and *in vivo* data. Accordingly, Dr. Berkland is merely illustrating a problem to be solved, rather than any solution to the problem. "A description that merely renders the invention obvious does not satisfy the [written description] requirement" because "it is the specification itself that must demonstrate possession." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351-52 (Fed. Cir. 2010). It is legally insufficient to "merely recite a description of the problem to be solved" and claim all

solutions to it "leaving it to the pharmaceutical industry to complete an unfinished invention." *Id.* at 1353.

Under comparable factual circumstances, the Federal Circuit has affirmed summary judgment for lack of adequate written description as a matter of law. For example, in *Boston Scientific*, the Federal Circuit affirmed summary judgment for lack of adequate written description support where the "claims covered tens of thousands of possible" species and there was "no guidance at all in the specification as to how to properly identify or choose the" species. *Bos. Sci. Corp.*, 647 F.3d at 1365. The court emphasized that "[t]he patent laws do not reward an inventor's invitation to other researchers to discover which of the thousands of [candidates] could conceivably work." *Id.* at 1366–67. This rule applies here, where Lipocine has not discovered the bounds of which oral TU formulation candidates would work to produce the claimed PK results.

Similarly, in *Carnegie Mellon*, the Federal Circuit affirmed summary judgment for lack of adequate written description where the claims were directed at an entire genus of bacteria including "thousands, and potentially millions, of unidentified species," but the specification disclosed only one type. *Carnegie Mellon Univ.*, 541 F.3d at 1125. The court emphasized that it "has long been the case that a patentee can lawfully claim only what he has invented and described, and if he claims more his patent is void." *Id.* at 1122. Like the patentee in *Carnegie Mellon*, Lipocine has overreached with the scope of the Asserted Claims, swallowing up thousands of oral TU compositions, which Lipocine has never made or tested to determine whether they may be useful in the claimed methods.

Also, in *Novozymes*, the Federal Circuit affirmed the lower court's JMOL of invalidity for lack of written description, because the specification provided "only generalized guidance listing several variables that might, in some combination, lead to a useful result." *Novozymes A/S v.*

23

*DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346 (Fed. Cir. 2013). While Novozymes argued that a person of skill in the art would have known how to test all of the possible variants within the scope of the invention as described, the Federal Circuit ruled that to possess the embodiments within the general scope of the specification "would have required Novozymes to confirm its predictions by actually making and testing individual variants or at least identifying subclasses of variants that could be expected to possess the claimed properties." *Id*. at 1350. Here too, Lipocine has not performed the necessary testing to support the breadth of the claims.

This case is also comparable to the facts of *Pernix*, where the claims were directed at methods of treating pain comprising administering a dose of an extended release dosage form that provided a release profile capable of achieving certain PK results. *Pernix*, 323 F. Supp. 3d at 576. This Court recognized that the asserted claims did not "recite methods of treatment involving the use of a particular identified formulation, or even a group of identified formulations" and that instead the claim limitations were largely functional in nature, defining "the claimed formulations according to whether they end up having those characteristics when tested." *Id*. at 618-619, 622. This Court also found that the specification disclosed only one formulation that was found to satisfy the functional limitations of the claims and failed to point to "any structural features" or other guidance that would assist a person of ordinary skill in the art in identifying species falling within the asserted generic claims. (*Id*. at 619, 622-624.) Thus, this Court concluded the claims were invalid for lack of written description because "testing results would be fundamental to determining which formulations would satisfy the asserted claims" and "in the absence of such testing data, the inventors cannot be said to have possessed the full scope of the claimed invention." *Id*. at 628. In this case, the PK testing is similarly fundamental to determining which formulations infringe, and which do not. Lipocine's "estimated" PK results for two species of compositions is

not adequate support for the thousands of potential compositions falling within the scope of the Asserted Claims.

In short, the Specification fails to provide adequate written description support because, at most, Lipocine has disclosed "only a research plan…leaving it to others to explore the unknown contours of the claimed genus." *AbbVie*, 759 F.3d at 1300.

### 2. The Asserted Claims Recite Dosing Parameters Which Differ from the Dosing Parameters Used in the "Simulated" Examples

The Asserted Claims are further lacking in written description support because the methods are directed to administration of a range of oral TU compositions initial doses, and a range of dose adjustment increments, that are different from, and much broader than, those used two species of "simulated" examples described in Examples 50-53 of the Specification. This is important because, as Lipocine's expert Dr. Berkland testified, "different doses would presumably impact [the] pharmacokinetic parameters." (Exh. F, Berkland Dep. Tr. at 111:11-22.)

Specifically, the Asserted Claims recite starting doses of either 360-480, 350-650, 450 or 480, or 480 mg/day followed by potential dose adjustments within the entire range of -40% through +40%, applying the Court's broad construction of "within ±40%." (D.I. 119 at 41-42.). (*See supra* at § III.A.) By contrast, the examples simulated starting doses of 150, 360-460, and 1000 mg/day (Example 40), 350-440 mg/day (Example 41), or 580-650 mg/day (Examples 44 and 45), all with dose adjustments of exactly +40% or -40% of the initial daily dose. (Exh. A, the '858 Patent at Examples 51-53 (Tables XXIII, XXIV, and XXV).) None of the "simulated" dose adjustment examples in the Specification used the claimed ranges of starting dose or identified such doses as critical. For example, none of simulations used a TU daily dose covering the claimed range of 360-480 mg, and the closest range, 360-460 mg TU was simulated only at +40% or -40% titrations. Such a disclosure is not sufficient to permit a POSA to "immediately discern" the full range of

starting dose values or dose adjustment increments recited by the claims. *Gen. Hosp. Corp. v. Sienna Biopharmaceuticals, Inc*., 888 F.3d 1368, 1372 (Fed. Cir. 2018) (citing *Purdue Pharma L.P. v. Faulding Inc*., 230 F.3d 1320, 1323 (Fed. Cir. 2000)).

The Specification discloses that "similar results are expected" using maintenance doses of ±25-55%. (Exh. A, the '858 Patent at 39:8-10; 39:50-52; 40:43-45.) Based on the "simulated" dose adjustments, the inventors disclosed a proposed dosing regimen in Example 55 which was limited to dose adjustments within the range of ±25-55%. (*Id*. at 42:35-67.) Nowhere does the Specification even purport to have analyzed or possessed the method using dose adjustment increments within the range of -25% to +25%, as is included within the claimed range of -40% to +40%. In addition, even though a daily dose of 360-480 mg TU is mentioned in this Example, the titration increment is not "within ±40%." Accordingly, there is no adequate written description for the claimed ranges of starting doses and dose adjustments.

### 3. The Asserted Claims Violate the "Quid Pro Quo" Which the Written Description Requirement Seeks to Protect

"Requiring a written description of the invention limits patent protection to those who actually perform the difficult work of 'invention'—that is, conceive of the complete and final invention with all its claimed limitations—and disclose the fruits of that effort to the public." *Ariad Pharm., Inc.*, 598 F.3d at 1353. This "is part of the *quid pro quo* of the patent grant and ensures that the public receives a meaningful disclosure in exchange for being excluded from practicing an invention for a period of time." *Id.* at 1354. Here, the *quid pro quo* is substantially one-sided.

For example, in deposition, one of the inventors admitted that ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████ The inventor explained that ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

     Moreover, while Example 45 is identified as one of the "inventive composition examples" in the Specification, ██████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████ *see also* D.I. 174 (Response to Counterclaims) at ¶¶ 79, 81.) Inventor Dr. Chidambaram admittedly ██████████████████████████████████████

████████████████████████████████████████  ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████

     Accordingly, the breadth of the Asserted Claims is particularly egregious in view of Lipocine's minimal contribution to the art. Lipocine effectively seeks to block the entire pharmaceutical industry (including Clarus) from using almost any oral TU composition to achieve desired PK results if the dose is adjusted at any point somewhere in the broad range of within ±40% of the previous dose. The inventor's ██████████████████████ on just two species of compositions does not provide a contribution to the art commensurate with this broad scope of exclusion.

---

[11] As stated previously, ██████████████████████████████████████████████████████
████████████

**B.      The Asserted Claims are Invalid for Lack of Enablement Under § 112**

The disclosure in the specification of the Patents-in-Suit is further insufficient to enable a POSA to practice the full scope of the invention of the Asserted Claims without undue experimentation. *Wyeth & Cordis Corp.*, 720 F.3d at 1384; *see also In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)*.* "Enablement is a question of law based on underlying facts." *Wyeth & Cordis Corp.*, 720 F.3d at 1384. In this case, there is no dispute that the Asserted Claims are overbroad and "cover more than was actually invented." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012).

As discussed above, the Asserted Claims cover methods of administering "many thousands" of oral TU compositions in order to achieve specifically claimed PK results. However, only two species of oral TU compositions have been evaluated using the claimed method, and both the inventors and parties' experts agree that the selection of excipients used to make the oral TU compositions will have an impact on the PK results. This means that each oral TU compositions must be made and tested to determine whether they meet the functional PK limitations of the claims. (*See supra* §§ III.D., IV.A.1.). Thus, the scope of experimentation needed to practice the full scope of the invention is undue and not commensurate in scope with breadth of the Asserted Claims. *See MorphoSys AG v. Janssen Biotech, Inc.*, 358 F. Supp. 3d 354, 371-72 (D. Del. 2019) (finding claims invalid where skilled artisan would need to "do essentially the same amount of work as the inventors" to practice their full scope).

The foregoing analysis of the *Wands* factors using the undisputed facts illustrates why summary judgment of invalidity is proper as a matter of law. *See Wyeth & Cordis Corp.*, 720 F.3d at 1385; *Enzo Life Scis.*, 928 F.3d at 1346-47; *Idenix Pharm. LLC.*, 941 F.3d at 1157.

### 1.    The Nature of the Alleged Invention and Breadth of Claims

As set forth above, the Asserted Claims are directed at methods of administering an oral TU composition and adjusting the dose within ±40% to achieve certain desired PK results. (*See supra* at §§ III.A-C.) The claims recite very few formulation restrictions and are primarily functionally defined in terms of whether the formulation "works" to provide the claimed PK results. (*See supra* at §§ III.B-C.) The scope of the Asserted Claims encompasses potentially at least "many thousands" of compositions which have never been made or tested. (Exh. 1, Amiji Op. Rep. at ¶¶ 31, 248-258, 266, 276, 288, 296.) Lipocine's expert Dr. Berkland does not dispute that the Asserted Claims encompass "many thousands" of formulations, and only disputes the degree of effort necessary to make and test them. (Exh. E, Berkland Reb. Rep. at *e.g.*, ¶¶ 131-134; 142-145; 148-151.) The claims are also open-ended "comprising" claims, further expanding their scope. *MagSil Corp.* 687 F.3d at 1383 ("The open claim language chosen by the inventors does not grant them any forgiveness on the scope of required enablement").

Thus, there can be no dispute that the claimed genus is vast—it is not finite, as stated by Lipocine's expert Dr. Goldstein. (Exh. M, Goldstein Dep. Tr. at 30:17-31:12.) This factor weighs strongly against enablement. *See Idenix Pharm. LLC*., 941 F.3d at 1157 (finding "many thousands" of candidate compounds overly vast); *Wyeth & Cordis Corp.*, 720 F.3d at 1385 (finding "tens of thousands" of candidates overly vast); *Enzo Life Scis.*, 928 F.3d at 1349 (finding "tens of thousands" of candidates overly vast).

### 2.    The State of the Prior Art and Predictability of the Art

The Specification recognizes that at the time of the invention "the effective oral delivery of testosterone and its esters remain[ed] a challenge" due to "extremely poor bioavailability." (Exh. A, the '858 Patent at 1:46-48.) The Specification notes that TU is "extremely lipophilic" and thus "must be presented in a bioacceptable solubilizer" and "research continues into the development"

29

of suitable formulations. (*Id.* at 1:67-2:9.) Clarus's expert Dr. Amiji explained that it would have been very difficult to predict the impact of formulation changes to a composition containing TU as the active ingredient, because TU is a complex "BCS Class IV drug." (Exh. 1, Amiji Op. Rep. at ¶ 245.)

Lipocine's expert Dr. Berkland agrees that TU is a "BCS Class IV drug" because of its "hydrophobic and poor permeability characteristics." (Exh. E, Berkland Reb. Rep. at ¶¶ 51, 52; Exh. F, Berkland Dep. Tr. at 134:18-135:1.) Dr. Berkland also agrees that "changes to the formulation may result in changes to the pharmacokinetic profile." (Exh. E, Berkland Reb. Rep. at ¶ 116.) And, Dr. Berkland agrees that because of this inability to predict the PK profile of a given formulation, and because of the lack of any known *in vitro* correlation experiments which can be used to predict the impact of formulation changes, a skilled artisan would need to conduct testing to determine which formulations described by the Specification could be useful in the methods of the Asserted Claims. Such testing would include a "multi-variable experiment" and "a fractional factorial design experiment" to collect *in vitro* data, which, according to Dr. Berkland, merely "***has the potential*** to be correlated to *in vivo* absorption results for further formulation development." (*Id.* at ¶ 134 (emphasis added).) The scope of Dr. Berkland's proposed testing is a tacit admission of the lack of predictability in the art.

As well, the fact that in the real world ███████████████████ using a starting dose of 450 mg and dose adjustments of ± 33% failed to meet the desired PK endpoints when tested in a phase 3 clinical study in human patients (D.I. 174 (Response to Counterclaims) at ¶¶ 122-126), despite the simulations predicting that all desired PK endpoints would be met (see Example 50-53), is evidence of the limited value of PK simulations as well as the larger lack of predictability in the art.

Accordingly, this factor weighs strongly against enablement. *See In re Fisher*, 427 F.2d 833, 839 (CCPA 1970) ("In cases involving unpredictable factors, such as most chemical reactions and physiological activity, the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved").

### 3.      Presence and Number of Working Examples

Each of the Asserted Claims requires administration of an oral TU composition to humans and adjusting the dosage within ±40% to achieve certain PK results. (*See supra* at §§ III.A-C.) As an initial matter, the Specification discloses no actual examples in which an oral TU composition is administered to humans at an initial dose wherein that dose is later adjusted based on measurement of testosterone serum levels. Rather, the Specification discloses only "estimated" PK values based on simulations carried out using a specific dose adjustment increment of either +40% or -40% based on an apparent assumption of dose proportionality that is not disclosed in the Specification. (Exh. A, the '858 Patent at Examples 51-53.) Thus, the Specification lacks actual working examples of the claimed dosing regimen and further lacks working examples commensurate with the scope of the Asserted Claims. Accordingly, this factor weighs strongly against enablement. *Idenix Pharm. LLC.*, 941 F.3d at 1160 ("An enabling disclosure must be commensurate in scope with the claim.")

### 4.      Amount of Direction or Guidance Presented

The Specification provides non-limiting laundry lists of hundreds of solubilizers, dispersants, solidifying agents, and additives to choose from, to be used alone or in combination, and at various concentrations. (*See supra* at §§ III.A-B.) The Specification does not describe any specific formulation approach, or any specific *in vitro* dissolution profile, which is believed to produce any desired PK result. Instead, the Specification simply asserts that oral TU compositions "can be formulated such that" such results are achieved. Moreover, the Specification discloses

31

only "estimated" PK results for two species of oral TU compositions, based on simulations of dose adjustments rather than actual clinical testing in human patients. The Specification provides no guidance on how a skilled artisan should go about "estimating" PK results for the many thousands of additional compositions, when no clinical data of any kind exists for those compositions on which to perform simulations. The lack of direction or guidance in the Specification weighs strongly against enablement because the Specification provides at most "only a starting point, a direction for further research." *Idenix Pharm. LLC*., 941 F.3d at 1160.

### 5.    Quantity of Experimentation Needed

Clarus's expert Dr. Amiji opines that because the formulation components would impact pharmacokinetic results, a skilled artisan would need to perform clinical testing in human patients on each composition to determine whether it would infringe. (Exh. 1, Amiji Op. Rep. at ¶¶ 264-267.) In response, Lipocine's expert Dr. Berkland does not dispute that a skilled artisan would need to "design, make, and test pharmaceutical compositions" to determine if they exhibit the claimed PK results upon administration. (Exh. E, Berkland Reb. Rep. at ¶ 131.) Dr. Berkland only disputes the level of testing necessary to evaluate each composition. (*Id*.)

Specifically, Dr. Berkland argues that "skilled artisans could feasibly make batches of different unit doses (*e.g*., 50 or more) …within one or two days" and "could have designed a multi-variable experiment, to evaluate the effect of various types and amounts of excipients on surrogate *in vitro* tests for assessing *in vivo* behavior, such as dissolution." (*Id*. at ¶¶ 132-133.) Dr. Berkland further argues that a skilled artisan could "set up a fractional factorial design experiment" in order "to expose information about the most important features of the formulation" and the "formulation results could then be used for further development, including correlation to existing clinical results and/or additional clinical testing." (*Id*. at ¶ 133.) However, Dr. Berkland does not identify any known *in vitro* to *in vivo* "correlation" tests for TU compositions, arguing only that "testosterone

undecanoate *in vitro* data has the potential to be correlated to *in vivo* absorption results for further formulation development." (*Id*. at ¶ 134.) And, the Specification also fails to identify any known *in vitro in vivo* correlation. Setting aside that the literature teaches that development of any *in vitro* "correlation" tests is "highly unlikely" for a BCS Class IV drug such as TU (Exh. 2, Amiji Reply Report at ¶¶ 8, 14, 16, 73, 127; Exh. P[12], Lu at 8) and accepting Dr. Berkland's testimony as true, this level of experimentation is still undue. Indeed, this level of experimentation is far beyond the level of experimentation carried out by the inventors. Accordingly, this factor weighs strongly against enablement. *See MorphoSys AG*., 358 F. Supp. 3d at 371-72.

6. **Summary Judgment is Proper in View of The Federal Circuit's Decisions in *Wyeth*, *Enzo*, and *Idenix***

Under comparable circumstance, the Federal Circuit has affirmed findings of invalidity for lack of enablement as a matter of law.

For example, in *Wyeth*, the Federal Circuit affirmed summary judgment for lack of enablement where the claims covered a range of structural analogs of sirolimus that exhibited immunosuppressive and antirestenotic effects, but the specification only disclosed one example, sirolimus, and provided no guidance or predictions about particular analogs that might have the same clinical effect. *Wyeth & Cordis Corp*., 720 F.3d at 1385. The court found there was no dispute that "at least tens of thousands" compounds met the structural limitations of the claims and that "it would be necessary to first synthesize and then screen each candidate compound using the assays disclosed in the specification to determine whether it has [claimed] immunosuppressive and antirestenotic effects." *Id*. The Federal Circuit found the "need to engage in a systematic screening process for each of the many rapamycin candidate compounds is excessive experimentation." *Id*.

---

[12] Lu et al., "In vitro-In vivo Correlation: Perspectives on Model Development", Published online Jan. 13, 2011, Published in final edited form as *Int. J. Pharm.* Oct. 10, 2011; 418(1): 142-148 ("Lu").

at 1386. Here too, a skilled artisan would need to engage in excessive screening and clinical testing to practice the full scope of the claimed invention.

Similarly, in *Enzo*, the Federal Circuit affirmed summary judgment for lack of enablement where the claims were directed to creating hybridizable and detectable nucleic acid probes and "the number of possible polynucleotides that would fit within the limitations of claim 1 would be at least 'tens of thousands,'" and where "each labeled polynucleotide would need to be tested to determine whether it is hybridizable and detectable upon hybridization." *Enzo Life Scis.*, 928 F.3d at 1348-1349. The Federal Circuit explained that even where a working example in the specification "describes one working embodiment with the claimed functionality, undue experimentation would still be required with regard to the many other embodiments of the claims based on the number of possible embodiments and the unpredictability in the art." *Id.* at 1349. In this case, there is not even a single working example where the claimed method is demonstrated in actual human patients. Instead there are only "estimated" PK results for two species of oral TU compositions based on dose adjustments of ±40% and assumed proportionality in clinical effect. Such a limited example is insufficient to enable a skilled artisan to practice the claimed method on thousands of different oral TU formulations which will have different PK characteristics, and using dose adjustments that are not restricted to just a 40% increase or decrease.

Finally, in *Idenix*, in the context of a method of treatment claim, the Federal Circuit affirmed the lower court's JMOL for lack of enablement because "a reasonable jury could only have concluded that at least 'many, many thousands' of candidate compounds exist" which would need to be screened for efficacy. *Idenix Pharm. LLC.*, 941 F.3d at 1157. The Federal Circuit noted that while it "is true that the specification contains some data showing working examples" that because the specification "encompasses tens if not hundreds of thousands" of candidates which

would "need to be tested for efficacy" that "four examples…are insufficient to support enablement." *Id*. at 1161. Similarly, in this case the data set forth in the Specification is extremely limited in comparison to the scope of the claims.

In view of this Federal Circuit precedent, given a skilled artisan would need to perform testing of thousands of formulations to practice the full scope of the invention, summary judgment of invalidity for lack of enablement is appropriate.

## V.   CONCLUSION

For the foregoing reasons, Clarus respectfully requests that the Court grant its motion for summary judgment that each of the Asserted Claims is invalid under 35 U.S.C. § 112 as failing to meet the requirements for written description and enablement.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Robert F. Green
Christopher T. Griffith
Caryn C. Borg-Breen
Ann K. Kotze
GREEN, GRIFFITH
& BORG-BREEN LLP
City Place, Suite 3900
676 North Michigan Avenue
Chicago, IL 60611
(302) 883-8000

Jeffrey S. Ward
GREEN, GRIFFITH
& BORG-BREEN LLP
8215 Greenway Blvd., Suite 220
Middleton, WI 53562
(312) 883-8000

October 2, 2020

*/s/ Brian P. Egan*
_____
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant Clarus Therapeutics, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 2, 2020, upon the following in the manner indicated:

Gregory R. Booker, Esquire                      *VIA ELECTRONIC MAIL*
Grayson Sundermeir, Esquire
Kelly A. Del Dotto, Esquire
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE  19899
*Attorneys for Plaintiff*

W. Chad Shear, Esquire                          *VIA ELECTRONIC MAIL*
Megan A. Chacon, Esquire
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA  92130
*Attorneys for Plaintiff*


*/s/ Brian P. Egan*
_____
Brian P. Egan (#6227)